# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

THE AMERICAN INSURANCE COMPANY, )
        Plaintiff,             )
                               )
   v.                           )          **No. 2:05 CV 68**
                               )
CROWN PACKAGING INTERNATIONAL, )
        Defendant.         )

## OPINION AND ORDER

During the times relevant herein, plaintiff, The American Insurance Company

("American"), had in force a commercial general liability insurance policy (hereinafter,

the "CGL Policy," "American Policy" or "Policy") issued to defendant, Crown

Packaging International ("Crown").[1] Crown sells plastic containers manufactured by a

wholly-owned subsidiary, Polycon Industries.[2] Crown's largest customer, Ecolab,

bought an ongoing supply of the containers in which to package its liquid soap

products. Ecolab began experiencing problems with some of the containers already

---

[1] The Policy, S64MZX80810962, is attached to American's amended complaint (DE # 52) as Exhibit A (DE # 52-2), and appears to be on the standard CGL form bearing the copyright of the Insurance Services Office. See *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010) ("Most CGL policies are written on standardized forms developed by an association of domestic property insurers known as the Insurance Services Office.")

[2] Crown's subsidiary, Polycon Industries, was also a named insured under the Policy. For the remainder of this discussion, the distinction between the parent and subsidiary is irrelevant, and references to Crown should be understood to include Polycon, and vice-versa.

filled with soap, and began deducting its expenses associated with the defective

containers from invoices from Crown. In other words, Ecolab began taking credits for

past purchases of defective containers against current purchases from Crown. The

parties refer to these credits as "chargebacks."

Crown sought indemnification for the amount of the chargebacks from

American. American denied the claim, and filed the present case seeking a judgment

declaring that, for multiple reasons, its CGL Policy does not apply. Before the court for

resolution is American's motion for summary judgment and Crown's cross-motion for

partial summary judgment.

**A. Factual Background**[3]

Unless the context makes it clear otherwise, the following facts are not in dispute.

Crown has sold containers to Ecolab for approximately thirty-five years, and Ecolab is

Crown's largest customer, accounting for thirty to thirty-five percent of Crown's

---

[3] The court's method of citing to the electronic case file for this action must be explained. Section B7.1.4 of the Nineteenth Edition of The Bluebook states that citations to documents in the court's CM/ECF system should use the document's name (e.g., "Rubio Dep.") and original internal pagination instead of the page number in the CM/ECF header imprinted on the document. Of all the inanities foisted upon the legal profession by The Bluebook, this one might take the cake. Documents filed with the court often have no page numbers. In other cases, where the document consists of multiple exhibits, it might contain multiple instances of internal page number sequences of 1 - X. Thus, page 12 of the "Rubio Dep." might be on physical page 60 of the document, and it might be one of a dozen other page twelves in the document. The CM/ECF system provides a unique document number for every filing, and assigns a unique page number to every physical page of the filing. The combination of these two numbers enables any reader with access to CM/ECF to easily find the exact information cited, and so is the only information the court will provide.

revenue. During the period relevant to this litigation—and as was their normal course of business—Ecolab sent Crown blanket purchase orders approximating the quantity of containers needed during a specific ensuing period of time. Crown would then make daily and weekly shipments of the containers pursuant to the purchase orders. On average, Ecolab purchased one million containers a month.

As part of the manufacturing process, Crown silk-screened graphics, for example, the name of the product and directions for its use, on the containers using art provided by Ecolab. After Ecolab received the containers, it filled them with its liquid soap products, and printed a date code on them using an ink-jet printer. In February 2003, Ecolab began experiencing a problem with about 20% of the Crown containers, causing the date code to fail to adhere and to be easily rubbed off ("the date-code problem"). In June 2003, Ecolab notified Crown of an additional problem, that the silk-screened graphics put on the containers by Crown were flaking off of some of the containers ("the graphics problem"). Both of the problems only became apparent after Ecolab had filled the containers with its soap products.

Crown attempted to determine the reason for the date-code problem by renting a printer from Ecolab like the ones Ecolab was using. Crown was unable to determine the basis of the problem (DE # 31-6 at 62), but the issue occurred only on containers manufactured by Crown, and not on similar containers Ecolab purchased from other manufacturers. (DE # 31-6 at 20, 39; # 31-10 at 19; 21.) Crown resolved the issue by purchasing a new laser printer for Ecolab that created an indelible code. (DE # 31-6 at

62.) As to the graphics problem, Crown investigated and discovered that the ink was flaking off because of three issues: improper strength of an ultraviolet light used to cure the ink printed on the container; additives in the ink interfering with its ability to adhere to the containers; and shipment of the containers to Ecolab too soon after manufacture, which did not allow long enough for them to cure.

Before the problems were resolved, however, Ecolab had to manually inspect its inventory of containers at the end of the manufacturing process, and dispose of or "rework" the soap found in defective containers,[4] employing additional labor to accomplish these tasks. Reworking the soap involved removing it from the containers by cutting them off the solidified soap, then "reblend[ing] the material into new batches at small percentages." (DE # 31-7 at 10-11.) In March 2004, Ecolab decided to dispose of the remaining defective containers filled with their product instead of reworking the soap because the amount of defective material being dealt with was impacting its manufacturing process. Whatever product could not be reworked within ninety days was scrapped. In addition, product was scrapped which had been returned to Ecolab by its customers because of the graphics flaking off, and product held in inventory in containers with the graphics flaking off was deemed unsaleable and scrapped.

Prior to the events in the present case, during the course of the lengthy business relationship between Ecolab and Crown, when Ecolab had experienced any problems

---

[4] Although Ecolab fills the containers with the soap in liquid form, it then hardens into a solid: "the product is a liquid when it goes in and within maybe a 15-minute period of time it's a rock." (DE # 31-6 at 21.)

with the containers Crown supplied, it typically resolved them using the chargeback method, i.e., giving itself a credit on current invoices. Pursuant to this customary practice, Ecolab deducted from its payments to Crown the cost of the defective containers at issue in the present case, along with the consequential costs incurred in dealing with the problem and scrapping significant portions of its product. Ecolab provided Crown with a series of nineteen "Chargeback Advisory" forms, informing Crown of the basis for the deductions from its payment. Thus, although Crown never affirmatively authorized the chargebacks, it was aware of them and Crown never demanded full payment by Ecolab, consistent with past practice. Before the incidents involved in the present case, Ecolab had never paid Crown for any other chargebacks taken. Nevertheless, in the present case Crown continues to carry the relevant chargebacks on its books as aging accounts receivable.

Ecolab's charge backs totaled about $454,122.68[5] between March 2003 and September 2004, $91,035.28 of which was from the ink date-code adhesion problem. (DE #28 at 8, ¶ 23.) The $91,035.28 figure was comprised of Ecolab's costs for reworking

---

[5] All of the dollar amounts in the accompanying paragraph should be considered approximate and subject to further proof. For example, as American explains, there is a $16,133.42 difference between the total of the chargebacks taken from the Chargeback Advisories submitted by Ecolab to Polycon, and the total on a June 16, 2004, chart prepared by Ecolab summarizing the chargebacks. (DE #28 at 10, n.1.) This total figure includes the "missing" $16,133.42, and thus does not equal the total obtained from adding the amounts itemized in the accompanying paragraph.

the soap and inspection, Ecolab's material loss, and "rental"[6] of the date code printer. (DE #28 at 8-9, ¶¶ 24-26.) The remaining portion of the total chargeback amount resulted from the graphics problem, which affected 15 to 20% of the containers and also caused Ecolab to rework some of the soap and place it in new containers, and to scrap some product. (DE # 27-2 at 69; DE #28 at 9-10, ¶ ¶ 28-31.) As of June 16, 2004, the chargebacks to Crown from Ecolab totaled $346,953.98 for this graphic adhesion problem. (DE #28 at 10, ¶ 32.)

Crown never expressly consented to the chargebacks for the date code ink adhesion or graphics adhesion problems. However, Crown's production manager's name (David Wilbourn) appears on the Chargeback Advisory forms as having authorized them on behalf of Crown. Wilbourn never discussed this with anyone from Ecolab nor did he know that his name appeared on the Chargeback Advisories.

In June 2003, Crown contacted Lockton Companies, its insurance broker, to notify American of its claim[7] under the Policy arising from the chargebacks for damage caused to Ecolab's property by Crown. In progress notes dated June 25, 2003, the claims adjuster investigating for American opined that a product recall was not involved,

---

[6] Crown did not make actual rent payments to Ecolab for the printer; instead, Ecolab added the cost of Crown's use of the printer to the chargebacks. Although the parties have not addressed precisely this issue, the court fails to see how any Crown expense incurred investigating the problem would be recoverable from American as property damage for which Crown is liable. In addition, it would seem to be a voluntary expenditure, barred by the voluntary payment provision discussed herein.

[7] American does not contend that notice given to Lockton Companies was insufficient to give notice to American.

because the product was not sent into the market, and indicated that Ecolab had already taken credit of about $40,000 in the form of chargebacks to Crown. (DE # 31-31 at 25.) From June 2003 through October 2004, Crown, directly and through Lockton, furnished American with documentation and information regarding the Ecolab claim, including all of the investigation records and chargeback records. However, American has refused to pay Crown for the claim, contending that several policy provisions apply to preclude any coverage.

American initiated this action by filing a complaint seeking a declaratory judgment that its CGL Policy does not provide indemnity to Crown for any of the chargebacks taken by Ecolab. In simple terms, the Policy issued to Crown covers "property damage" caused by an "occurrence." The Policy excludes coverage when the insured voluntarily makes a payment, assumes any obligation, or incurs any expense without first receiving American's consent. Furthermore, the Policy excludes property damage to the insured's product itself, or to property of a third party which is "impaired" because of a defect in the insured's product which has been incorporated into the third party's product; and excludes coverage of expenses associated with the recall of a product. The complaint contains seven counts, each of which seeks a declaration as to one of these Policy provisions.

American moved for summary judgment on each count of the complaint, contending that some of the Policy provisions operate so that Crown is not entitled to any indemnity, and some (most notably, the exclusion for recalled products) operate to

exclude part of the damages for which Crown seeks indemnity. Crown moved for partial summary judgment, claiming that the policy provisions at issue apply to provide coverage. Crown's motion is for partial summary judgment because it concedes that a question of fact may exist as to count VII of the complaint, concerning the voluntary payment provision.[8] Both parties supported their motions with memoranda, responses to the other party's motion, and replies in support of their own. In addition, at the request of Judge Lozano, who formerly presided over this case, the parties filed additional memoranda on the issue whether Ecolab's chargebacks were tantamount to a voluntary payment made by Crown.

**B. Standard of Review**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009).

---

[8] The court thinks that simply for the reason discussed *supra* at 6 n.6, there would be a question of fact preventing Crown from obtaining summary judgment on Count VII.

This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to RULE 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## C. Analysis

American seeks summary judgment on each count of its complaint, arguing that various Policy provisions independently operate so as to avoid or exclude coverage, either in whole or in large part. It organizes and groups its arguments in the manner in which the court will address them, as follows: (1) Crown assumed obligations without American's consent contrary to the Policy terms; (2) the chargebacks were not on account of "property damage" caused by an "occurrence;" (3) the Policy's exclusions for "damage to your product" and "damage to your work" exclude coverage; (4) the Policy's exclusion for damage to impaired property excludes coverage, and; (5) the

Policy's exclusion for recalled products excludes coverage. Crown's cross-motion seeks a summary determination that none of these provisions bars coverage, except for the voluntary payment provision, as to which Crown concedes there is a question of fact.[9]

**(1) *"Voluntary payments" provision***

The American CGL Policy, as is common in many liability insurance policies, contains a "voluntary payments" provision precluding coverage if the insured voluntarily makes a payment, assumes an obligation, or incurs an expense other than for first aid without first obtaining the insurer's consent. Section IV(2)(d) of the Policy states:

> No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(DE # 52-2 at 16.) The purpose of a provision like this is twofold, and is intended to give the insurer the ability to control settlement negotiations with the injured party, and to prevent an the insured party from conspiring with a third party to receive benefits. *See Coil Anodizers, Inc. v. Wolverine Ins. Co.*, 120 Mich. App. 118, 124, 327 N.W.2d 416, 418 (1982); *Gribaldo, Jacobs, Jones & Assoc. v. Agrippina Versicherunges A.G.*, 3 Cal. 3d 434, 449, 476 P.2d 406, 415 (1970).

---

[9] American's response (DE # 34) to Crown's motion incorrectly states that Crown does not seek summary judgment of Count III of its complaint. Nevertheless, American's memorandum does address the substance of Crown's argument on count III.

American argues that this provision precludes Crown from indemnification because Crown voluntarily accepted Ecolab's chargebacks without the consent of American. Further, Crown did not dispute the chargebacks nor did it ever demand that Ecolab pay the amounts which it had charged back. Crown, on the other hand, maintains that the provision at issue requires an affirmative act to pay the third party. Because it never made a payment to Ecolab, and instead Ecolab made the chargebacks unilaterally with neither Crown's permission nor affirmative acquiescence, Crown did not voluntarily make a payment or assume an expense (or, Crown asserts, at the very least a question of fact exists as to whether Crown acted voluntarily). As Crown sees it, Ecolab's conduct left it with no choice: if Crown had demanded payment for defective merchandise, it simply would have exacerbated the situation, possibly causing Crown to lose Ecolab as a customer. Moreover, Ecolab likely would have refused payment, and the situation would be no different except for the loss of Ecolab's business.

The essence of American's argument, however, is that Crown did effectively consent to, and authorize the chargebacks, because of its prior history of allowing Ecolab to take such chargebacks, and its failure, in the present matter, to ever demand full payment from Ecolab. In other words, as American sees it, Crown's affirmative assent to the chargebacks is the only inference which can be drawn from the past history between the parties, and Crown's failure to demand payment from Ecolab or voice any objection to the amount of the chargebacks.

No doubt the economic result of Crown's inaction is the same as if Ecolab had paid the full amount of Crown's invoices, demanded a refund, and Crown acceded to that demand. That clearly would be a voluntary payment which the American Policy wouldn't cover. In both cases (that is, whether Crown made a refund or assented to non-payment), Ecolab is made whole while American is potentially denied the benefits of the voluntary payment provision, if it had no opportunity to investigate the claim and negotiate a settlement. If American had that opportunity, it in all likelihood could have driven a harder bargain than Crown did when it accepted the unilateral decisions of its largest customer.[10] Thus, there is an initial attractiveness to treating Ecolab's non-payment the same as Crown having made a refund, and holding that the voluntary payment provision negates coverage.

In its supplemental memorandum (DE # 43), American points out one Michigan case which has done essentially that, *Coil Anodizers*. Surprisingly, this appears to be one of only two cases addressing the precise issue of whether acquiescing to non-payment, such as Crown did in this case, precludes coverage under a voluntary payment provision. In the *CoilAnodizers*, the insured's metal-anodization treatment damaged its customer's product. 120 Mich. App. at 120, 327 N.W.2d at 417. The customer told the insured that it would hold the insured liable for the cost of replacing the defective

---

[10] In point of fact, Crown drove no bargain at all. In his deposition, Crown's President, Dennis Tilles, testified that Crown didn't fight Ecolab on the chargebacks because it was "beyond the doubt" that Crown had caused the problem and he feared that Crown was going to lose Ecolab as a customer. (DE #27-2 at 36-37.)

product. *Id.* The insured then informed its insurance carrier of its potential liability, but the insurer denied coverage (the court decision does not explain the reason for this initial denial). *Id.* The insured *then agreed* that its customer could set off the cost of replacing the damaged product against its accounts payable. *Id.* The court held that this set-off arrangement constituted voluntary payment, recognizing that the purpose of the voluntary payment clause was to prevent collusion between the insured and a third party and to give the insurance company control over settlement negotiations. 120 Mich. App. at 123-24, 327 N.W.2d at 418. Since the insurance company was not given the opportunity to negotiate the settlement, indemnification was denied under the voluntary payment provision.[11] *Id.*

Essentially, the reasoning of the court in *Coil Anodizers* is that the insured had to wait for its customer to sue it for damages, even though the court recognized that the insured undoubtedly felt compelled to accept its customer's demands in order to retain goodwill. *Id.* The court's observations on this issue address Crown's argument that it had no choice under the circumstances but to sue Ecolab, which would have resulted in losing it as a customer. As the *Coil Anodizers* court explained, those compelling business circumstances didn't make the insured's actions "any less voluntary" and deprived the

---

[11] A significant distinction should be pointed out, however. The court also rested its decision on another policy provision which conditioned the insurer's obligation to indemnify on a formal judgment against the insured. 120 Mich. App. at 123, 327 N.W.2d at 418. That provision makes the reason for denying payment in *Coil Anodizers* stronger, and American is not relying on a similar provision in the present case. Nevertheless, the portions of the case discussing the voluntary payment provision are still instructive.

insurer of its "bargained for . . . contractual right to contest the liability of its insured instead of having its money given away by an agreement to which it was not a party." 120 Mich. App. at 123, 327 N.W.2d at 418.

The second case involving acquiescence to non-payment is *New England Extrusion, Inc. v. American Alliance Ins. Co.*, 874 F. Supp. 467 (D. Mass. 1995). The insured maufactured plastic film used for food packaging, some of which turned out to be defective. A customer of the manufacturer demanded compensation for food which had spoiled. Eventually the manufacturer agreed to allow the customer to take credits against future orders. The manufacturer's insurer denied the claim, relying on what it claimed were the insured's breaches of notice and voluntary payment provisions in the CGL policy at issue. *Id*. at 470. The court denied the insurer's motion for summary judgment, holding that the insurer had not shown actual prejudice, as required by Massachusetts law. *Id*. at 471.

American admits that there is a "dearth" of Indiana authority on the issue. (DE # 28 at 12.) In its opening memorandum in support of its motion, it essentially relies on only *Askren Hub States Pest Control Servs., Inc. v. Zurich Ins. Co.*, 721 N.E.2d 270 (Ind. App. 1999). In that case, however, the insured, a pest inspector, voluntarily agreed to, and did, perform repairs to a third party's home without the insurer's knowledge or consent. Thus, the case does not involve the present circumstances, where a third party withholds payment from the insured. Moreover, the *Askren* case was decided on the

issue of the insured's failure to give the insurer timely notice, and not on the issue of the voluntary payment clause. 721 N.E.2d at 279.

There appear to be only two other cases involving Indiana law which shed any light, and very little light it is. In *Governmental Interins. Exch. v. City of Angola, Ind.*, 8 F. Supp. 2d 1120, 1135 (N.D. Ind. 1998), the City of Angola sought to recover from its general liability insurer costs it had incurred, without the insurer's consent, in cleaning up contaminated soil caused by a leaking underground storage tank. The insurer denied coverage based on a number of policy provisions, including a voluntary payment provision. This court, speaking through then-Chief Judge William C. Lee in the Fort Wayne Division, held that the voluntary payment provision did not bar coverage, primarily because the clean-up costs expended by the city were required by state and federal environmental laws, and so were not truly voluntary. *Id*. at 1134-35.

That is a significant distinguishing factor from the present case, despite Crown's argument that it did nothing voluntary here. Crown's established practice of accepting Ecolab's chargebacks lends a voluntary quality to Crown's conduct that is absent in *City of Angola*. However, other comments in *City of Angola* put the present case in a different light. For example, in addition to the primary reason for rejecting application of the voluntary payment provision, Judge Lee also observed that: 1) the insurer, when notified of the claim, immediately denied coverage based on other policy provisions, so nothing would have turned out differently had Angola notified it of the claim before incurring the clean-up expenses, and; 2) there was no evidence of collusion between the

city and the contractors it paid. For both reasons, the insurer had not suffered the prejudice the clause was designed to prevent. *Id*. at 1135. It can also be said in the present case that it appears nothing would have turned out differently had Crown demanded payment from Ecolab.[12]

The second case involving Indiana law is *Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192 (Ind. App. 2005). In *Liberty Mutual*, the insured incurred defense expenses before notifying its insurer of litigation brought against it. Although the court mentioned both the voluntary payment provision and a provision requiring the insured to give the insurer prompt notice of any claims, its analysis focused solely on the notice provision. It subsumed any consideration of the voluntary payment provision within its analysis whether the insurer was prejudiced by its insured's failure to give notice. *Id*. at 200-204. An important distinction from the present case is that the insured in *Liberty Mutual* was actually being sued. The *Liberty Mutual* court found the insurer was prejudiced because, in the period before it was notified of the suit, it was denied the opportunity to propose a settlement or guide the course of the litigation; denied the opportunity to choose the attorney it preferred; and denied the chance to negotiate the

---

[12] Crown also argues that American has not shown, or even alleged, the existence of collusion between Crown and Ecolab. Based on existing Indiana case law, American would have seen no need to do so. Thus, although it appears there was no collusion, in the sense of fraudulent conduct directed against American, American should have the opportunity to make that showing if it becomes necessary to do so. Moreover, the court does not reject out-of-hand the possibility that Crown's uncritical acceptance of the amount of Ecolab's chargebacks might serve as a form of collusive conduct, for the purpose of showing prejudice.

amount of attorneys' fees. *Id*. at 204. Based on the facts the parties have provided, none of those factors is present in the controversy before this court. Thus, to the extent, if any, that *Liberty Mutual* is helpful, it appears to suggest that the notice/prejudice inquiry may be relevant to the voluntary payment issue, and that typical types of prejudice which result from failure to give notice are not apparent in an acceptance of non-payment situation.

What this all boils down to is that in the present case, American is essentially asking the court to follow the reasoning of *Coil Anodizers,* and hold that Crown's non-compliance with the voluntary payment provision precludes coverage, without any consideration whether that non-compliance caused American prejudice. Although Crown objects that, unlike *Coil Anodizers* and every other case cited by American, it did not affirmatively authorize Ecolab to take the chargeback credits at issue, American's point is well-taken: Crown effectively consented to those chargebacks based on the twenty-five year course of dealing between the parties allowing similar credits, and by its failure to object in the present case. Having said that, however, on the facts before the court it is difficult to see how American suffered prejudice, that is, what would have been different if Crown had demanded Ecolab full payment. Giving Crown the benefit of reasonable inferences, Ecolab would have refused: as American states, "Crown admittedly manufactured defective containers." (DE # 38 at 15.)[13]

---

[13] Then, presumably, Crown would have had to bring suit demanding payment, and Ecolab would counterclaim for the cost of the defective containers and consequential damages therefrom. The obvious question raised is whether by bringing

This is the basis of the additional argument that Crown makes in its supplemental memorandum (DE # 44): that even if the chargebacks come within the voluntary payment provision, American has not shown how it suffered any prejudice, and based on the circumstances just outlined, there is at least a question of fact on the issue of prejudice. The court agrees that American hasn't shown, as an undisputed fact, that it suffered actual prejudice from Crown not having demanded that Ecolab stop taking chargebacks and making full payment. The problem is, there is no Indiana case definitively establishing whether American must do so with respect to the voluntary payment provision, and in the circumstances herein.

It is this court's task, sitting in diversity, to predict how the Indiana Supreme Court would decide the issue. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999). Decisions by the state's appellate courts are given great weight in making this prediction, *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002), but in the present case that gives the court only *Liberty Mutual*, discussed above, bolstered by the commentary in *City of Angola*. When there is an absence of authority, relevant cases from other jurisdictions may be consulted. *Amerisure, Inc. v. Wurster Const. Co., Inc.*, 818 N.E.2d 998, 1004 (Ind. App. 2004) (*abrogated on other grounds by Sheehan Constr.*, 935 N.E.2d 160).

---

that suit, Crown would incur attorneys' fees and other expenses which American might contend were voluntary, and so not covered by the Policy.

As already noted, *Coil Anodizers* did not consider the issue of prejudice. The court stated only that the insurer had been deprived of its bargained-for contractual right to contest the liability of its insured, essentially treating the matter as a breach of a contractual condition precedent, barring coverage, with a showing of prejudice unnecessary. The only other relevant case[14] identified by the parties, *New England Extrusion,* is essentially the opposite. It explains that under Massachusetts law, the insurer must prove that it suffered actual prejudice in order to rely on the voluntary payment provision to deny coverage.

The question is whether Indiana would follow either of these two approaches, or adopt some other. As is explained in *New England Extrusion*, the purpose of the voluntary payment provision is the same as a policy provision requiring the insured to provide notice to the insurer of a claim: to allow the insurer to become involved, conduct a timely investigation, and protect its interests. 874 F. Supp. at 470. Not coincidentally, the notice and voluntary payment provisions appear together in the standard CGL policy, as they do in this case. Indiana is in agreement with Massachusetts on the purposes served by the notice requirement in an insurance policy. *See Brunner v. Economy Preferred Ins. Co.*, 597 N.E.2d 1317, 1319 (Ind. App. 1992).

Unlike Massachusetts, however, Indiana does not require an insurer to demonstrate actual prejudice before asserting a breach of the policy's notice provision

---

[14] Crown also cites *Pacific Ins. Co. Ltd. v. Eaton Vance Mgmt.*, 260 F. Supp. 2d 236 (D. Mass. 2002). Because it is simply another application of Massachusetts law, it doesn't add to the weight of Crown's argument.

to deny coverage. Instead, the insurer enjoys a presumption of prejudice, which the insured may rebut by showing an absence of prejudice. *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1005-05 (Ind. 2009).[15] The insurer has to demonstrate prejudice only if the insured rebuts the presumption. *Id.*; *see Liberty Mut. Ins. Co.*, 831 N.E.2d at 203. This is a third approach, also different from both *New England Extrusion* and from *Coil Anodizers,* in which no showing of prejudice was required.[16]

In light of the foregoing, especially considering that voluntary payment provisions serve the same purpose as notice provisions, and the Indiana *Liberty Mutual* and *Askren* decisions, which seem to treat notice provisions and voluntary payment provisions on the same footing, it is this court's informed guess that, were the Indiana Supreme Court to decide the issue, it would apply Indiana's rule on notice to the voluntary payment provision. In other words, there is a rebuttable presumption of

---

[15] Another important point from *Tri-Etch* must be mentioned. To the extent this court's decision in *City of Angola* can be read to suggest that an insurer's reliance on other policy provisions to deny coverage rebuts the presumption of prejudice as a matter of law, *Tri-Etch* holds otherwise. Instead, it is a fact issue whether the insurer would have relied on the other provisions had it been given timely notice. 909 N.E.2d at 1005.

[16] *Coil Anodizers* dates from 1982. In 1998 Michigan joined Massachusetts, requiring insurers relying on late notice to deny coverage to show actual prejudice. *Koski v. Allstate Ins. Co.*, 456 Mich. 439, 444, 572 N.W.2d 636, 639 (1998). Thus, it is unclear whether *Coil Anodizers* remains good law. Michigan might extend *Koski* to voluntary payment provisions, or it could treat *Koski* as a limited to notice provisions only. See *DeFrain v. State Farm Mut. Auto Ins. Co.*, – N.W.2d –, 2011 WL 832181 (Mich. App. 2011) (*Koski* carved out a narrow prejudice requirement).

prejudice from an insured's having made a voluntary payment. If the presumption is rebutted, the insurer must then demonstrate prejudice.

In the present case, there are undisputed facts which rebut the presumption. As American admits in its statement of undisputed facts (DE # 28 at 8, ¶ 23), the Ecolab chargebacks spanned the period from March 2003 to September, 2004. American first had notice of the claim[17] June 16, 2003, (DE # 38 at 16; DE # 31-7 at 18), and American was actively investigating the claim as early as June 25, 2003, and was aware through its claims adjuster, Richard Bragg, that Ecolab had already charged back about $40,000 to Crown, and would be "putting together . . . a list of their damages and will be sending to our insd." (*Id.*)(DE # 31-31 at 25.)  In other words, at that point less than 10% of the amount of alleged damages at issue in this case had been taken as chargebacks by Ecolab.[18]

Whether or not Crown is solely responsible for the chargebacks which had already occurred, there is no reason apparent in the facts before the court why American could not have intervened between the parties at that point, by hiring a

---

[17] American disputes this, arguing that at that time it only had notice of the date-code aspect of the claim. (DE # 34 at 4, ¶ 8.) Accepting this as true, the distinction makes no difference to the court's analysis.

[18] American contends that Bragg didn't receive "supporting information and documentation" of the chargebacks until December 2004, when they totaled $114,871. (DE # 38 at 8, 17.) Accepting this as true, Bragg nevertheless had notice of the chargebacks as early as June 25, 2003; and approximately 75% of the chargebacks still occurred after he/American received the supporting information and documentation in December.

lawyer of its choice to pursue full payment from Ecolab—in other words, have availed itself of the rights which the voluntary-payment provision is designed to create/preserve. If Ecolab resisted, there is nothing in the facts before the court suggesting why American could not have indemnified Crown, subrogating itself to Crown's rights, and then sued Ecolab for payment, which would have allowed American to determine if Ecolab were inflating its damages or scrapping soap which instead could have been easily and cost-effectively reworked and reused. (As American states in its specification of undisputed facts, Ecolab did not decide to scrap the remaining quantities of soap until March, 2004. (DE # 28 at 10, ¶ 31.).) In this court's view, these facts are enough to rebut any presumption of prejudice resulting from at least those chargebacks occurring after American had notice. American has made no showing that prejudice in fact did occur;[19] therefore, American is not entitled to a summary judgment on Count VII of its complaint, regarding the voluntary payment provision.

---

[19] The court has not ignored American's argument that it informed Crown's President, Dennis Tilles, of the voluntary payment provision in a letter dated January 27, 2004, but that Crown continued to "allow" the chargebacks after that date. It is true that a letter was sent to Tilles directing his attention to the voluntary payment provision and quoting it. (DE # 38 at 20-21.) The letter did not, however, do anything more, such as explain that American viewed or might view the credits Ecolab was taking as falling within that provision. That interpretation of the provision would not manifest itself easily to a layperson; indeed, it was not obvious to the court, and even after the research resulting in this order the court is not positive it is a correct interpretation. Moreover, the letter did not advise Tilles what steps Crown should take to prevent, or resist, further chargebacks from occurring. The court does not mean to suggest, however, that it agrees with Crown's argument that this shows American consented to the chargebacks, but these facts are relevant to the issue of prejudice.

**(2)** *Property Damage Caused by an Occurrence*

For the Policy to provide coverage for damage caused to a third person's

property, that "property damage" must result from an "occurrence," within the

meaning of those terms as defined in the Policy itself. Count I of American's complaint

seeks a declaration that there was no "property damage." Count II seeks a declaration

that there was no "occurrence." The Policy, using bold face to indicate the use of

defined terms, in "Coverage A, Bodily Injury and Property Damage Liability," provides

in part as is relevant here:

> 1. Insuring Agreement
>
> a. We [American] will pay those sums that the insured becomes legally
> obligated to pay as damages because of **bodily injury** or **property damage**
> to which this insurance applies. We will have the right and duty to defend
> the insured against any **suit** seeking those damages. . . .
>
> b. This insurance applies to **bodily injury** and **property damage** only if:
>     (1) The **bodily injury** or **property damage** is caused by an
>     **occurrence** that takes place in the coverage **territory**.

(DE # 52-2 at 5.)

The Policy defines "property damage" in Section V, paragraph 17(a)-(b) as

"[p]hysical injury to tangible property, including all resulting loss of use of that

property" and "[l]oss of use of tangible property that is not physically injured." (DE

# 52-2 at 21.) An "occurrence" is defined by Section V, paragraph 13, as "an accident,

including continuous or repeated exposure to substantially the same general harmful

conditions." (DE # 52-2 at 12.) Although the term "accident" is not defined by the CGL

Policy, under Indiana law an "accident" is "an unexpected happening without an intention or design." *Tri–Etch, Inc.,* 909 N.E.2d at 1002 (internal quotation marks and citation omitted).

American maintains that there is no coverage because there was neither "property damage" to Ecolab's property nor did anything that happened to Ecolab's property result from an "occurrence." In its cross-motion, Crown maintains exactly the opposite: that the facts show that Ecolab suffered "property damage" caused by an "occurrence" as is defined by the Policy.

(a) *Property Damage*

As stated above, the Policy covers two types of damage to a third person's property: physical injury to the property; or loss of its use, even if it is not physically injured. First, American contends that there was no physical injury to Ecolab's property. The rubbing and flaking off of date codes and graphics on the outside of the containers manufactured by Crown did not cause a physical injury to Ecolab's soap products inside the containers. Second, American argues that the loss of use provision does not apply, because it is undisputed that Ecolab reworked and reused some of the soap, and could have done so with all of it, but instead made a financial decision to scrap most of the faulty containers and soap therein.

Crown's response, and its argument on this issue in support of its own motion for partial summary judgment, are one and the same. Crown argues its product—the containers—was incorporated into Ecolab's product; that is, Ecolab's "product was

24

comprised of both the Soap and the Containers." (DE # 36 at 17.) The problems with the containers did not become apparent until after the soap was placed in the containers and hardened; thus, at that point the containers of soap could not be sold, and could not be salvaged without destroying the containers to remove the hardened soap. Therefore, Crown argues, there was physical injury to Ecolab's property (the containers which had to be cut apart), and Ecolab suffered a loss of use of both the containers and the soap therein which had to be scrapped. (DE # at 11-12; DE # 36 at 17-18.)

As to the "physical injury" aspect of "property damage," American argues in its reply that "Crown has confused the distinction between what constitutes Ecolab's *product* versus what constitutes Ecolab's *property*," and that "[w]hile generically it is true that the plastic containers filled with Ecolab's soap are Ecolab's *property* in that Ecolab maintains ownership interest, the plastic containers do not become Ecolab's *product* for coverage purposes." (DE # 38 at 9, 10.) Actually, it is American that has become somewhat confused, by looking at the forest—whether Crown is ultimately entitled to indemnity—and losing sight of the trees: whether "property damage" as defined by the Policy has occurred.

To explain, it is useful to consider the Indiana Supreme Court's brief explanation of how a CGL policy operates:

> Most CGL policies are written on standardized forms developed by an association of domestic property insurers known as the Insurance Services Office ("ISO"). *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 772, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993). "[These] policies begin with a broad grant of coverage, which is then limited in scope by exclusions. Exceptions

to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. However, it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought." David Dekker, Douglas Green & Stephen Palley, *The Expansion of Insurance Coverage for Defective Construction,* 28 Constr. Law, Fall 2008, at 19, 20.

*Sheehan Constr. Co. v. Continental Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010). American's argument, that Crown has ignored the distinction between property and product, itself is an example of American ignoring the distinction between the coverage provisions of its Policy, and the exclusions from coverage that only come into question if coverage exists in the first instance. The definition of "product" may be relevant once it becomes necessary to consider exclusions, but the term "product" is nowhere to be found in the initial insuring agreement, defining the "property damage" that is covered by the Policy. Thus, by admitting that "generically it is true that the plastic containers filled with Ecolab's soap are Ecolab's *property,*" (DE # 38 at 10), American has made irrelevant its argument that property damage did not occur because the soap inside the containers was undamaged, and conceded that manufacturing defects in the containers necessitating their destruction was physical damage to Ecolab's *property*, making that property damage potentially covered by the Policy.[20]

---

[20] As stated, American's admission results from the fact that it is only necessary to consider the definition of "product" in the Policy exclusions if there is covered property damage in the first instance. *Cf. Sheehan Constr. Co.*, 935 N.E.2d at 167 (*quoting with approval, internal citation and quotation omitted, Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 307 (Tenn. 2007): "[r]eliance upon a CGL's 'exclusions' to determine the meaning of 'occurrence' has resulted in regrettably overbroad generalizations concerning CGLs."). In fact, American's attorneys should be embarrassed for making a coverage argument based on Policy exclusions, because they

As to the "loss of use" aspect of "property damage," the parties' dispute centers on whether the soap inside the containers, although not physically damaged in any way, was in fact useless, as Crown contends, or whether Ecolab simply made a business decision to scrap soap which it could have salvaged.[21] It is undisputed that, after attempting to rework and reuse the soap in the defective containers, Ecolab decided to scrap any containers which could not be reworked within 90 days. (DE # 27-3 at 8.) Ecolab made this decision because reworking the soap was having too great a detrimental impact on its production: "the amount of material that was backing up in the system became unmanageable." *Id*. In other words, what American characterizes as a "business decision" was dictated by economic reality: while the soap literally could have been reworked and so was useable, the cost of doing so—presumably, but this is addressed further below—made that option unprofitable and so not viable.[22] It should

---

understand the difference well. When Crown does essentially the same thing, arguing that an exclusion does not apply because property damage occurred, American labels the argument "illogical" because the exclusion "like any other exclusion, serves to exclude coverage once coverage is triggered in the first instance" and so need not be considered before then. (DE # 38 at 14.)

[21] Obviously, in addition to physical injury, Ecolab lost the use of the containers which had to be destroyed to remove the soap therein.

[22] To be clear, the court assumes this is so: it is unlikely that a company would choose to destroy product if it were more profitable to rework and re-use it. However, neither party has pointed to evidence establishing as an undisputed fact whether the cost of re-use was greater, or less than, the cost of destruction. Because there are cross-motions for summary judgment, Crown is entitled to an inference of the former, and American to an inference of the latter. The court comments further on this issue when it considers the Policy's exclusion for "damage to impaired property."

go without saying that insurance companies are familiar with this concept. When the cost of repairing an automobile damaged in an accident is greater than the cost of buying an equivalent replacement vehicle, an auto insurer declares the vehicle a total loss, and the owner receives a check for its market value.

Nevertheless, the court has been unable to find, and neither have the parties identified, any Indiana cases discussing whether an economic loss of use (a complete loss, not simply a diminution in value) comes within the "loss of use" provision in a typical CGL policy.[23] However, the court thinks that even a layperson (many of whom have first-hand experience with the damaged auto hypothetical above) would answer affirmatively, if asked whether a party whose use of an item is to sell it at a profit has lost the item's use when it is so damaged that it is cheaper to throwing it away is less expensive than salvage. Moreover, this is the conclusion reached in the most relevant cases the court has found, such as by the Third Circuit in *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808 (3rd Cir. 1994).

In that case, Lucker designed and manufactured a "lateral mooring system" ("LMS") used to anchor offshore drilling platforms. Because of defectively-manufactured castings Lucker purchased from a supplier to incorporate into the LMS, Lucker had to increase its costs to include additional safety features in its design;

---

[23] *Aetna Life & Cas. v. Patrick Industries, Inc.*, 645 N.E.2d 656, 659 (Ind. App. 1995) considers only the physical injury aspect of property damage, not loss of use. In addition, the diminution in value therein resulting from the damage did not cause a complete economic loss of the third party's property.

without those additional features, its customer, Shell Oil, would not accept the original design. When Lucker sued its supplier for the increased costs, the supplier's CGL insurer denied coverage on the basis that Lucker's purely economic loss was not a "loss of use" of its property. The Third Circuit rejected this argument:

> Of course, Lucker did not suffer physical injury to the LMS (since it did not exist) or the LMS design. Nor did it lose the physical use of the LMS or LMS design. Indeed, Lucker could still have manufactured it and offered it for sale, and, even according to Lucker, the original LMS design would still have worked properly. Nevertheless, Lucker did lose the *economic* use of the original LMS design: because of the defective castings, Shell was no longer willing to buy the product, and Lucker could no longer use the LMS design as a source of income.

> The question in this case, therefore, reduces to whether the lost "use" has to have been a lost *physical* use of the property, or whether it can also include a lost *non-physical* or *economic* use of the property. The district court thought that loss of use should cover only lost physical use, and that customer acceptance simply was not a "use." We believe, however, that both the purposes behind liability insurance and the case law interpreting liability insurance suggest that the loss of a non-physical use of a product, such as offering it for sale, should be considered a "loss of use"; and that the decreased value of a product because of loss of customer acceptance of the product is a "loss of use" within the meaning of the standard CGL policy.

*Lucker Mfg.*, 23 F.3d at 815-16. 808 (3rd Cir. 1994)[24] (internal citation omitted); *see also Anthem Electronics, Inc. v. Pacific Employers Ins. Co.*, 302 F.3d 1049 (9th Cir. 2002) (third party's economic loss caused by replacing scanners in which insured's defective circuit boards were installed was loss of use of its tangible property, the scanners); *American Family Mut. Ins. Co. v. Teamcorp., Inc.*, 659 F. Supp.2d 1115, 1130 (D. Colo. 2009) (where

---

[24] It should be noted that the *Lucker* court ultimately determined that no coverage existed because the design of the LMS was not tangible property. 23 F.3d at 821.

defects in construction would require house to be torn down, both physical injury and loss of use provisions of CGL policy arguably applied); *Wells Dairy, Inc. v. Travelers Indemnity Co. of Illinois*, 241 F. Supp. 2d 945, 966 (N.D. Iowa 2003) (diminution in value of perishable ingredients within property damage provision of CGL policy where potential use of ingredients completely lost);[25] *Elizabethtown Water Co. v. Hartford Cas. Ins. Co.*, 998 F. Supp. 447, 454 (D.N.J. 1998) (real-estate developer's complete inability to put property to intended use as saleable residential lots because of insured's negligence within loss-of-use provision in CGL policy); *Sola Basic Indus., Inc. v. United States Fidelity & Guar. Co.*, 90 Wis.2d 641, 280 N.W.2d 211, 213 (1979) (third party unable to use

---

[25] However, the court in *Wells Dairy* noted:

> "There is case law from other states supporting the general premise that "[d]iminution in value—even to the point of worthlessness—is not the same as 'loss of use damages.'" *Vogel v. Russo*, 236 Wis. 2d 504, 613 N.W.2d 177, 184 (2000); *see Smartfoods, Inc. v. Northbrook Prop. & Cas. Co.*, 35 Mass. App. Ct. 239, 618 N.E.2d 1365, 1368 (1993); *see also Nutmeg Ins. Co. v. Pro-Line Corp.*, 836 F. Supp. 385, 388 (N.D. Tex. 1993) (holding that loss of sales of plaintiff's product did not constitute the "loss of use of tangible property" within property damage definition); *Hawaiian Ins. & Guar. Co. v. Blair, Ltd.*, 6 Haw. App. 447, 726 P.2d 1310, 1313 (1986) (holding that allegations showing diminution in value of plaintiff's "product-line" did not constitute the "loss of use of tangible property" within property damage definition).

The *Wells Dairy* court distinguished each case, and in addition to that court's analysis, this court notes that in *Vogel*, the third party couple did not completely lose use of their home; in *Smartfoods*, cancellation of a distribution agreement led to excess inventory, but there was nothing wrong with that inventory; in *Nutmeg Ins.*, the third-party's product was unsaleable because its reputation was damaged by slanderous remarks, but nothing was otherwise wrong with its product; and in *Hawaiian Ins.*, there was nothing wrong with the third party's product, but it had become unsaleable because of the insured's damage to the market by selling similar goods that were fakes.

furnace to manufacture goods because of damage to insured's electrical transformer which powered furnace, and incurred additional costs to keep its plant in operation; those costs recoverable as a diminution-in-value measure of the loss of use of the furnace); *Pittway Corp. v. American Motorists Ins. Co.*, 56 Ill. App. 3d 338, 342, 370 N.E.2d 1271, 1274 (1977) (manufacturer of aerosol hair spray had to scrap cans which incorporated insured's defective spray valve: "we have found what we conclude to be a majority position which holds that the term 'property damage' includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property").[26]

The court thinks that Indiana would employ eminently-sensible logic as in *Lucker*, and adopt what the Illinois appellate court described in *Pittway Corp.* as the majority view that "the term 'property damage' includes tangible property which has been diminished in value or made useless irrespective of any actual physical injury to

---

[26] *But cf. Hamilton Die Cast, Inc. v. U. S. Fidelity & Guar. Co.*, 508 F.2d 417, 419 (7th Cir. 1975) (tennis-racket manufacturer withdrew rackets from the market because frame supplied by insured was defective: "We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes 'property damage' within the meaning of the policy"); *Dreis & Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681, 687 (7th Cir. 1977) (third-party lost use of special structure built to house insured's defective component). However, *Hamilton Die Cast* does not consider whether the manufacturer lost the use of those rackets. In *Dreis & Krump* the policy required loss of use resulting from damage to tangible property, 548 F.2d at 687, unlike the American Policy herein, which includes loss of use damages for property which is not physically injured. In addition, *Pittway Corp.* distinguishes both cases. In *Pittway Corp.* the court stated that where the third party therein had to scrap product because of the insured's defective component "there is injury in the sense of the diminution in value of the product manufactured and owned by a third party." 56 Ill. App. 3d at 248, 370 N.E.2d 1275.

the tangible property." 56 Ill. App. 3d at 342, 370 N.E.2d at 1274. *See Amerisure, Inc.*, 818

N.E.2d at 1004 (Ind. App. 2004) (defining "occurrence" in CGL policy: "Our case law in

this area is limited, so we look to other jurisdictions for guidance"). Ecolab could not

sell its soap in the containers manufactured by Crown without incurring substantial

additional costs, which may have been so great that it would cause a smaller loss to

simply scrap the soap. If that is the case, then there was a loss of use of the soap.

The problem that remains is that neither party has established, as an undisputed

fact, how the cost of salvaging the soap compared to the cost of scrapping it. Crown's

assertion that the soap had to be destroyed is based on the deposition statement of an

Ecolab representative that too much soap was "backing up" in the system. American

argues this means that Ecolab simply made a financial decision, but as has just been

explained, a rational financial decision means that coverage exists. Presumably, Ecolab

would not choose to destroy product if it were more profitable to rework and re-use it.

However, companies sometimes make poor or wrong decisions. There is also

conflicting evidence in the record on the matter. For example, Crown's President,

Dennis Tilles, stated in his deposition that Ecolab "tried to reformulate [the soap], but it

was just too labor intensive. It was cheaper just to scrap it." (DE # 31-7 at 10.) On the

other hand, William Greiner, of Ecolab, stated that at least for those containers only

impacted by the date-code problem, they could be "either run back through the date

coder again or a small pre-printed label was applied . . . with the date code on it." (DE

# 31-10 at 23.) Because there are cross-motions for summary judgment, Crown is

entitled to an inference that Ecolab's soap could not be re-used in a cost-effective manner, and American is entitled to an inference that it could.

For the reasons above, there was both physical damage to, and loss of use of, Ecolab's property at least to the extent of containers which had to be destroyed to remove the soap. There is a question of fact whether Ecolab's soap could be cost-effectively reworked and re-used, or whether it was cheaper to scrap it. As a result, Crown is entitled to a partial summary judgment on count I, in that Ecolab suffered property damage to some extent.[27] Whether the extent of that damage includes the soap in the containers remains a question of fact. American's motion on count I is denied.

(b) *Occurrence*

Although, as just explained, there was both physical damage to, and loss of use of, Ecolab's property constituting property damage under the Policy, the Policy in addition requires that such property damage result from an "occurrence." As noted earlier herein, the Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (DE # 52-2 at 20.) Although the term "accident" is not defined in the Policy, Indiana has defined the term as "an unexpected happening without an intention or design." *Tri–Etch, Inc.,* 909

---

[27] Section I(1)(a) of the Policy covers property damage which Crown "becomes legally obligated to pay as damages." (DE # 52-2 at 5.) Crown admits that no cause for the date-code problem was ever found, making it unclear that Ecolab would be able to prove, unless perhaps by *res ipsa loquitur* (except the containers were no longer in Crown's control), that Crown was liable for damages caused by the problem. American has not argued this as reason to avoid coverage, however.

N.E.2d at 1002 (internal quotation marks and citation omitted; *Newnam Mfg. v. Transcontinental Ins. Co.*, 871 N.E.2d 396, 402 (Ind. App. 2007).

Until recently, Indiana adhered to the view that poor workmanship is not unintentional; therefore, damages which result from poor workmanship are not an accident, and so not an "occurrence" as the term is used in a standard CGL policy: "[F]aulty workmanship is not an accident and, therefore, not an occurrence." *Amerisure v. Wurster Const. Co.*, 818 N.E.2d 998, 1004 (Ind. Ct. App. 2004). Thus, in *Amerisure*, where a subcontractor did a poor job installing an exterior sheathing and insulation system on a building project, the general contractor's CGL policy did not cover replacement costs, because there was no property damage caused by an occurrence.[28]

American relies on *Amerisure* and its precursors, to argue that the problems with the containers were the "natural and ordinary consequences of" Crown's faulty workmanship, and therefore there was not an "occurrence" which caused property damage. (DE # 28 at 20.)[29] Last year, however, and after American filed its motion, the Indiana Supreme Court abrogated the rule in *Amerisure*, holding "we align ourselves

---

[28] The court found it significant, however, that there were "no allegations that any person or property, *other than* these interconnected systems on the buildings being constructed by Wurster, was damaged due to these defects." *Amerisure*, 818 N.E.2d at 1004. This is unlike the present case, where there was damage to other property, the soap Ecolab put in the containers, and lost use of. Thus, even before more recent Indiana precedent, there may have been an "occurrence" in the present case.

[29] American mainly discusses *Jim Barna Log Sys. Midwest v. General Cas. Ins. Co. of Wisconsin*, 791 N.E.2d 816 (Ind. App. 2003), and *R.N. Thompson & Assoc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160 (Ind. App. 1997).

with those jurisdictions adopting the view that improper or faulty workmanship does constitute an accident so long as the resulting damage is an event that occurs without expectation or foresight." *Sheehan Const. Co.*, 935 N.E.2d at 169.

In *Sheehan*, water damage occurred to homes because of the faulty workmanship of a subcontractor in installing windows, shingles and flashing. *Id.* at 163. The general contractor's CGL insurer obtained summary judgment declaring that it had no duty to indemnify because, among other reasons, the subcontractor's faulty workmanship was not an "occurrence." *Id.* at 164, 171. The Indiana Supreme Court, abrogating the rule from *Amerisure* and earlier cases, reversed that judgment. In the Court's view:

> The question presented is whether faulty workmanship is an accident within the meaning of a standard CGL policy. In our view the answer depends on the facts of the case. For example, faulty workmanship that is intentional from the viewpoint of the insured cannot be an "accident" or an "occurrence." On the other hand if the faulty workmanship is "unexpected" and "without intention or design" and thus not foreseeable from the viewpoint of the insured, then it is an accident within the meaning of a CGL policy.

*Id.* at 170. The court reasoned that if the faulty workmanship was unintentional, then any damage that resulted would be unexpected and unforeseeable, and so be an accident constituting an "occurrence." *Id.* at 170. The court reversed the judgment in favor of the insurer because there was no evidence whether the faulty workmanship resulted from intentional, or unintentional, conduct. *Id.* at 172.

In the present case, American's argument is:

> There is no evidence of record that Polycon somehow manufactured its containers for Ecolab in a manner or method contrary to the manner of

> [sic] method it intended to employ. Rather, the evidence is clear that after
> Polycon containers were manufactured and sold to Ecolab, the date codes
> and/or labels were coming off of a percentage of the containers. . . . [T]hat
> the date codes or labels were rubbing or flaking off of the Polycon
> containers are the natural and ordinary consequences of Polycon's faulty
> workmanship. And, the natural and ordinary consequences of an act do
> not constitute an "occurrence."

(DE # 28 at 20.) Even if this is all true, applying *Sheehan* to this argument, American's conclusion based on *Amerisure* is now incorrect. Viewing the evidence in the light most favorable to Crown, it may have followed the manufacturing steps it meant to follow, but its intention was to manufacture containers which Ecolab would find acceptable, on which date codes and labels could be printed; Crown did not intend to manufacture defective containers, on which the date codes and labels would flake off, resulting in Ecolab having to destroy the containers to remove the soap placed therein, and eventually having to destroy much of the soap itself.

On the other hand, viewing the evidence in the light most favorable to American, Crown has not established that there is undisputed evidence that all of its manufacturing problems were unexpected. For example, did Crown decide to ship its containers sooner than it had previously, assuming there would be time for them to cure before Ecolab used them? Did Crown decide to use a cheaper and less powerful ultraviolet light, not worrying that it would be too weak to perform the job? In short, applying *Sheehan* to the facts of record, neither party has shown it is entitled to summary judgment on Count II of American's complaint.

### (3) "Business Risk" Exclusions

The American Policy, as a typical CGL policy, contains a number of exclusions commonly referred to as "business risk" exclusions. *See Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 423 (7th Cir. 2005) ("so-called 'business risk' exclusions . . . are standard fare in contemporary CGL policies.") The purpose of business risk exclusions is to exclude coverage of risks that could be avoided by the insured company itself; that is, to effectuate the intent of the parties that the CGL coverage be for tort liability resulting from the product and/or work of the insured company, and not a warranty on the quality of the product or work itself. *United Capitol Ins. Co. v. Special Trucks, Inc.*, 918 F. Supp. 1250, 1257 (N.D. Ind. 1996). In counts III - VI of its complaint, American argues that three of the business risk exclusions operate to preclude coverage for all or most of the damages Ecolab held Crown accountable for.

### (a) "Damage to Your Product" and "Damage to Your Work" Exclusions

Sections I .2(k) and (l) of the Policy (DE # 52-2 at 9) exclude coverage for property damage to "your product" or "your work," when the damage arises from the product or work itself. The "your" means the insured party, Crown. As is relevant for the purposes of the present discussion, section V(21) of the Policy defines "your product" as goods and products manufactured and/or sold by Crown, and section V(22) defines "your work" as work and operations performed by Crown, or on its behalf. (DE # 52-2 at 21.) These two provisions "clearly exclude insurance coverage for damages to the insured's product or work when such damages are confined to the product or work and

caused by the product or work, or any part thereof." *Indiana Ins. Co. v. DeZutti*, 408

N.E.2d 1275, 1280 (Ind. 1980).

American argues that Ecolab's cost of purchase of all of the unusable Crown

containers is excluded because the containers were Crown's product and/or work, and

damage to Crown's product and work (loss of use being a form of damage) is exactly

what is excluded. In addition, American argues that Ecolab's labor costs for inspecting,

and either reworking or destroying, the defective containers are excluded because they

are "nothing more than consequential damages arising out of the defective containers

manufactured by Polycon and are no way related to 'property damage' of another." (DE

# 28 at 22.) Crown's response is that "American's argument can be boiled down to the

incorrect assertion that the only damage that occurred was to Crown's product." (DE

# 36 at 21.)

Both parties are half right and half wrong. Crown's argument ignores the fact

that even if American is wrong that the *only* damage was to Crown's product, it is

nevertheless true that a significant portion of the damage which occurred *was* to

Crown's product; that is, the cost of the defective containers. That cost, charged back by

Ecolab to Crown, is clearly excluded by the "your product" and/or "your work"

exclusions.

American is wrong, however, in arguing that Ecolab's labor costs for inspecting,

and either reworking or destroying, the defective containers are excluded as

consequential damages arising out of the defective containers manufactured by Crown

and so completely unrelated to any damage to Ecolab's property. American ignores the fact that the soap in the defective containers was Ecolab's property, and the cost of inspecting, reworking and destroying the defective containers was incurred by Ecolab to avoid shipping soap which would only be returned, to salvage soap from defective containers, and to resume its normal manufacturing process.

Moreover, American's argument that the exclusions apply to any consequential damages "arising out of" Crown's product or work, results from a bad misreading of the exclusions. Using the "your product" exclusion to explain, the exclusion states that what is not covered is: "**Property damage** to **your product** arising out of it or any part of it." (DE # 52-2 at 9, ¶ (k).) The phrase "arising out of" does not mean, as American argues, that property damage suffered by a third party as a consequence of a defect in the insured's product are excluded. If it did, the CGL Policy would, practically speaking, provide no property damage coverage at all. Instead the provision excludes only property damage to the insured's product itself, when that damage arises from some condition in the product itself or a part of it. To reiterate and perhaps be redundant, the exclusion only applies to "damages to the insured's product or work when such damages *are confined to the product or work* and caused by the product or work, or any part thereof." *Indiana Ins. Co.*, 408 N.E.2d at 1280 (emphasis added). In sum, the cost of Crown's defective containers is excluded from coverage; Ecolab's costs incurred in inspecting, reworking and disposing of the defective containers are not. What this means is that while the court denies both parties' motions for summary

judgment as to counts III and IV of the complaint, the parties' rights and obligations with respect to the exclusions addressed by those counts are clarified.

*(b) "Damage to Impaired Property" Exclusion*

Count V of the complaint seeks declaratory relief on a third business risk exclusion in the Policy, which states that there is no coverage for:

> **Property damage** to **impaired property** or property that has not been physically injured arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**.

(DE # 52-2 at 9 ¶ (m).) As the court has already determined herein, there was loss-of-use property damage to Ecolab's soap, resulting from Crown's defective containers.[30] American argues that Ecolab's soap was "impaired property," and as its loss of use was caused by a defect in Crown's product, the containers, this exclusion negates coverage.

The Policy defines "impaired property" as:

> tangible property, other than **your product** or **your work**, that cannot be used or is less useful because . . . [i]t incorporates **your product** or **your work** : that is known or thought to be defective, deficient, inadequate or dangerous . . . if such property can be restored to use by . . . repair, replacement, adjustment or removal of your product or your work[.]

(DE # 52-2 at 18 ¶ 8.) American argues that "applicability of the 'Damage to Impaired Property' exclusion contained in the American Policy to the facts at hand is unmistakable, and the case of *Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417 (7th Cir. 2005) is controlling." (DE # 28 at 23.) This is hyperbole: although *Sokol* is highly

---

[30] This determination is only for the purpose of deciding the Policy coverage issues raised in this action. It is not a conclusive determination, should American contend otherwise vis-a-vis Ecolab, that Crown caused Ecolab's property damage.

useful—but perhaps in a way unanticipated by American—it is an application of Illinois law, and so not "controlling" in this case governed by Indiana law.

Crown's response is, first, that the exclusion does not apply to property which is physically damaged, and Ecolab's soap was physically damaged when it had to be scrapped. Second, Crown argues that the *Sokol* case, along with *Hamlin Inc. v. Hartford Accident & Indemn. Co.*, 86 F.3d 93 (7th Cir. 1996), shows that the exclusion applies only when the insured's defective component can simply be replaced, leaving the third-party's property useable. This is unlike the present case, where Ecolab's soap was rendered unuseable and had to be scrapped. In its reply memorandum, American has responded to the first argument, but not the second.

Crown's first argument is that Ecolab's soap was physically damaged, and the exclusion does not apply when there is physical damage. The court disagrees with both propositions. Ecolab's soap, inside the containers, was physically undamaged and remained in the condition Ecolab intended for it to be in, until Ecolab scrapped it. Ecolab's economic decision to throw out undamaged soap is not physical damage to the soap. The only damage that occurred was loss of use.

But even were this not the case, the exclusion nevertheless applies even when there *is* physical damage. The exclusion applies to property damage "to **impaired property** *or* property that has not been physically injured." (Italics added.) If it is necessary to specify that the exclusion applies equally to property not physically injured, then "impaired property" must include property which might be physically

injured. The Policy's definition of "impaired property" as tangible property that cannot be used, or is less useful, because it incorporates the insured's defective product does not rule out physical injury to the tangible property. Moreover, as American points out in its reply, the exclusion doesn't even come into play until there has been property damage, and property damage is either physical injury, or loss of use. In short, Crown's first argument is a lost cause.

But Crown's second argument, unaddressed by American, is potentially fruitful. Crown argues that *Sokol* and *Hamlin* both show that the exclusion applies only when the insured's defective component can be replaced, making the third party's product useable again, but Ecolab's soap had to be destroyed. Like so many of the arguments made in the pending cross motions, this is only partially correct, or, more precisely, is an incomplete analysis. Consistent with Crown's interpretation of the cases, the exclusion in the American Policy specifically states that it applies only if the impaired property "can be restored to use by . . . repair, replacement, adjustment or removal of your [Crown's] product or your work[.]" Where Crown goes astray is in asserting that Ecolab's soap *had* to be destroyed. The facts show that it could have been reworked and placed in new containers, and some of it in fact was, but the time came when Ecolab decided it was no longer feasible to do so, and scrapped what remained. The question that remains is whether the exclusion applies *no matter how great the cost* of restoring the impaired property to use might be: that is, does the phrase "can be restored to use"

mean that if it is literally possible to do so, even if economically unreasonable, the property is only "impaired" and the insured has no coverage?

This is why a close look at the facts in *Sokol* and *Hamlin* is critical. In both cases the impaired property exclusion applied (although this appears to be *dicta* in Hamlin). In *Sokol* the insured provided packets of peanut butter, which turned out rancid, that were incorporated into third-party Continental's cookie-mix boxes. Continental sold the boxes to distributors, but before any of the boxes were sold to consumers, the rancid peanut butter was discovered. Continental recalled the boxes, opened them, and put new peanut-butter packets inside. The cost of performing this swap was $75,441.20, which Continental demanded from the insured. *Sokol and Co.*, 430 F.3d at 420, 422. Presumably, Continental performed the swap because $75,000 was less expensive than refunding the purchase price to the distributors and telling them to destroy the product (and facing loss of reputation and goodwill, and unknown litigation costs, if undestroyed packages somehow reached the market and sickened consumers). The opinion does not mention whether it would have been cheaper for Continental simply to recall and destroy the boxes, losing their use entirely.

In *Hamlin*, the insured made liquid crystal displays ("LCD") which were sold to a third-party which incorporated them into instrument panels it manufactured, and the instrument panels were then sold to manufacturers who placed the panels in tractors. Later, after the tractors were bought and being used by farmers, the LCDs quit working. The farmers had the tractors repaired under warranty, and the cost of those repairs was

shifted back up the line to the LCD manufacturer. The court remarked that the facts precisely fit the "impaired product" exclusion. *Hamlin Inc.*, 86 F.3d at 96. Undoubtedly, repairing and replacing the LCD display in every instrument panel was an expensive proposition; but undoubtedly less expensive than destroying every tractor. *Hamlin* has nothing to say about those alternative circumstances, for example, if every piece of steel used in the tractor had been defective, requiring it to be dismantled and rebuilt from the ground up, a process more expensive than simply replacing it with a new tractor.[31]

In the court's view, *Sokol* and *Hamlin* do stand for the proposition that even when the costs of restoring impaired property to its intended use are substantial, the exclusion for damage to impaired property will apply. However, neither case suggests that when the cost of doing so is greater than the value of the property, the exclusion will still apply. The plain language of the exclusion in the American Policy, applied literally, suggests this is the case: if the property "can be restored to use by . . . repair, replacement, adjustment or removal" of the insured's defective component, it is impaired. Hypothetically however, if an "impaired" bucket of soap cost Ecolab $2.00 to manufacture in the first place will cost $3.00 to salvage, the "impairment" becomes a complete loss in economic terms.

---

[31] In fact, *Hamlin* does not even mention whether the exclusion therein contained the prerequisite that the impaired property be capable of being returned to use. Presumably, as a standard CGL policy, it did, but this was simply not a factor in the case.

Generally speaking, language in a contract which is plain need only be applied, not interpreted. But beyond the fact that exclusions in insurance contracts are narrowly applied, *American States Insurance Co. v. Kiger,* 662 N.E.2d 945 (Ind. 1996), contracts are also to be read to effectuate the parties' intent, and not to produce an absurd result. *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 539 (Ind. 1997); *Allied Fidelity Ins. Co. v. Lamb*, 361 N.E.2d 174, 178-79 (Ind. App. 1977). It would be absurd to assume that the parties meant for the impaired property exclusion to apply when the cost of repairing the property exceeds its value. That the literal language of the Policy could produce this absurdity makes it ambiguous, and interpreting ambiguous language to be commercially reasonable and to make economic sense is a sound approach. *Utica Mut. Ins. Co. v. Vigo Coal Co., Inc.*, 393 F.3d 707, 711 (7th Cir. 2004); *Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 280 F.3d 744, 748 (7th Cir. 2002).

Thus, the court concludes that property is "impaired property" only when the cost of restoring it to use does not exceed its value, which, in the case of damaged property in the possession of its manufacturer, is likely the cost of simply producing a new replacement. If producing a replacement is cheaper, the property is a loss, not impaired, and the exclusion for damage to impaired property does not apply.

What this means in the present case is this: neither party has shown that it is entitled to summary judgment on the exclusion for damage to impaired property. It is undisputed that Ecolab made a financial decision to scrap a large portion of the damaged backlog of soap. But as was already explained above in regard to whether

Ecolab suffered property damage, neither party has proved the facts motivating that decision. Giving Crown the benefit of reasonable inferences, presumably the decision was compelled by economics, that is, it was cheaper just to replace the soap with new soap than to rework and reuse it. But giving American the benefit of all reasonable inferences, that isn't the only possibility. It's possible that Ecolab calculated its costs incorrectly, or didn't calculate them at all, and made a huge mistake by scrapping the soap. As a result, neither party is entitled to a summary judgment on count V of American's complaint.

   *(c) "Recall of products" exclusion*

   Count VI of American's complaint seeks a declaration on the Policy's "recall of products" exclusion. As relevant here, exclusion (n) in the Policy applies to any losses, costs or expenses that are incurred by any person for the loss of use, or withdrawal or recall from the market, of the insured's product or work, or of any impaired property. (DE # 52-2 at 9-10.) American argues that it is undisputed that Ecolab recalled product from Japanese customers, so any costs associated with that recall are excluded.

   Crown argues that American's position is based on a mischaracterization of the deposition testimony of Ecolab's purchasing manager, William Greiner, who stated only that some Japanese customers returned some of Ecolab's product. (DE 31-11 at 18.) For the purposes of summary judgment, the court accepts that this is the case. This does not, however, show that the exclusion does not apply, as Crown believes. The exclusion applies to "any loss, cost or expense incurred by . . .others for the loss of use . . . removal

or disposal of: . . . **Impaired property**; if such . . . property is withdrawn . . . from use by any person or organization because of a known or suspected defect." (DE # 52-2 at 9-10.) Thus, any losses, costs and expenses associated with the products returned by Japanese customers would be excluded, if the Ecolab products being returned were "impaired property." As discussed in the analysis above, there is a question of fact as to whether Ecolab's completed soap products were impaired property. Therefore, neither party is entitled to summary judgment on count VI of American's complaint.

**D. Conclusion**

For the foregoing reasons, American's motion for summary judgment (DE # 27) is **GRANTED IN PART AND DENIED IN PART**; Crown's motion for partial summary judgment (DE # 29) is **GRANTED IN PART AND DENIED IN PART**.[32]


**SO ORDERED.**


Date: August 24, 2011

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT

---

[32] It should be noted that although the parties' motions addressed American's original complaint, the only change made by the amended complaint was to correct American's jurisdictional allegations.